**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
By:     Andrew S. Kasmen, Esquire (#58926)
         Brooke E. Newborn, Esquire (#209732)
         Matthew Olesh, Esquire (#206553)
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Phone: (215) 665-3000                     *Counsel for Plaintiffs Isabella Pizza Inc., Bella*
andrew.kasmen@obermayer.com         *Investment Properties, LLC, and*
brooke.newborn@obermayer.com        *Linda R. Martorano*
matthew.olesh@obermayer.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ISABELLA PIZZA INC., BELLA INVESTMENT PROPERTIES, LLC, AND LINDA R. MARTORANO,<br><br>Plaintiffs,<br><br>v.<br><br>TIOGA-FRANKLIN SAVINGS BANK and INNOVATIVE FINANCING & CONSULTING GROUP, LLC, d/b/a INNOVATIVE FINANCING SOLUTIONS,<br>Defendants. | Civil Action No.<br><br>**COMPLAINT WITH DEMAND FOR A TRIAL BY JURY** |

Plaintiffs Isabella Pizza Inc., Bella Investment Properties, LLC, and Linda R. Martorano by way of Complaint against Defendant Tioga-Franklin Savings Bank and Innovative Financing & Consulting Group, LLC, d/b/a Innovative Financing Solutions, aver as follows:

**NATURE OF ACTION**

1.      This matter arises from a loan from Defendant Tioga-Franklin Savings Bank to Plaintiffs Isabella Pizza Inc. and Bella Investment Properties.

2.      As further alleged herein, Tioga-Franklin Savings Bank failed to abide by contract and credit terms, failed to process a loan application in a timely fashion, improperly increased the

interest rate charged to Isabella Pizza Inc. and Bella Investment Properties, and, most remarkably, failed to provide a loan pursuant to the stated approval of the Small Business Association, all of which resulted in Plaintiffs suffering substantial, irreversible financial harm and lost opportunity costs.

3.     Innovative Financing & Consulting Group, LLC, d/b/a Innovative Financing Solutions was Tioga-Franklin Savings Bank's administrator and underwriter for Small Business Association loans, and its errors and delays led directly to the damages suffered by Plaintiffs.

4.     Accordingly, Plaintiffs now file the instant claims for violations of fair lending practices, fair debt collection practices and for fraudulent inducement.

## PARTIES

5.     Plaintiff Isabella Pizza Inc. ("Isabella Pizza") is a Pennsylvania corporation with an address of 3243 Chaucer Street, Philadelphia, Pennsylvania 19145.

6.     Plaintiff Bella Investment Properties, LLC ("Bella Investment Properties"), is a Pennsylvania limited liability company with an address of 3243 Chaucer Street, Philadelphia, Pennsylvania 19145.  Isabella Pizza and Bella Investment Properties are hereinafter collectively referred to as the "Companies."

7.     Plaintiff Linda R. Martorano ("Martorano"), is an adult individual residing in the Commonwealth of Pennsylvania, with an address of 3243 Chaucer Street, Philadelphia, Pennsylvania 19145.  The Companies and Martorano are hereinafter collectively referred to as "Plaintiffs".

8.     Defendant Tioga-Franklin Savings Bank ("TFSB") is a banking organization of the Commonwealth of Pennsylvania, with an address of 320 East Girard Avenue, Philadelphia, Pennsylvania 19125.

9.      Defendant Innovative Financing & Consulting Group, LLC, d/b/a Innovative Financing Solutions ("Innovative") is a Pennsylvania limited liability company with a registered business address of 79 Chadwick Circle, Eagleville, Pennsylvania 19408.

## JURISDICTION AND VENUE

10.     By virtue of a federal question and supplemental jurisdiction, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

11.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(1), because the defendant's corporate office and registered address are located in the Eastern District of Pennsylvania.

## FACTS

12.     In 2019, Martorano, on behalf of and as the owner of the Companies, applied to TFSB for a Small Business Association ("SBA") Small Loan under the Section 7(a) loan program, which is the SBA's primary business loan program for providing financial assistance to small businesses.

13.     The Companies applied for the SBA loan to refinance existing obligations and to enable the Companies subsequently to obtain construction funding through the SBA.

14.     TFSB's SBA administrator, Innovative, was paid $2,500 to process the application. *A true and correct copy of Innovative's Consulting Services Engagement Agreement is attached hereto and made a part hereof as Exhibit A.*

15.     Innovative failed to perform proper diligence and failed to gain a full understanding of relevant facts that were material to the application.

16.     The Loan was, per the SBA's guidelines, to close within sixty (60) days of the date of application, and be for an amount not greater than five hundred thousand dollars ($500,000.00) at an interest rate no more than five percent (5%).

17.     This timing was critical. Both TFSB and Innovative were aware at all times that the Companies were in critical need of the financing, which is why the Companies sought a loan under the Section 7(a) program.

18.     Incredibly, more than seven (7) months after the application was submitted, at the end of June 2020, not only had the loan not closed, but, due to TFSB's and Innovative's wrongdoings (having "lost paperwork", improperly stopped processing the request, and demanded production of the same information numerous times), processing of the Loan request was still incomplete.

19.     For example, the first SBA application that TFSB and Innovative submitted to the SBA in June 2020 listed Plaintiff Martorano's spouse, Steven Martorano, as a borrower when neither he nor Plaintiff Martorano intended him to be on the loan.  Plaintiff Martorano and Mr. Martorano had to point out to TFSB that Mr. Martorano should not be a borrower or guarantor on the loan, and TFSB and/or Innovative was supposed to go back to SBA and correct the issue, as well as other issues with the terms.  However, there is no evidence that TFSB or Innovative ever went back to the SBA.

20.     Innovative failed to perform proper diligence and failed to gain a full understanding of relevant facts that were material to the application, which resulted in the SBA approving loan terms in July 2020 that were materially different than those for which the Companies applied, which Defendants could not accept.

4916-8175-3399 v7

21.     Attempting to placate Plaintiffs, TFSB offered to establish a bridge loan until TFSB could correct its errors in processing the application.

22.     Being in critical need of funding to, *inter alia*, pay off existing creditors, and, because of TFSB's and Innovative's actions and inaction, the Companies, having no options at this point, and understanding, based on TFSB's representations, that this was to be a temporary solution while TFSB and Innovative finalized a loan on terms approved by the SBA, Plaintiffs were forced to enter into a not more than one-year (1-year) bridge loan at six percent (6%) interest proposed by TFSB -- versus the four-and-a-quarter percent (4.25%) ultimately approved by the SBA. *A true and correct excerpt from the deposition of Irving Chai, TFSB's deputy chief credit officer, dated February 19, 2025, is attached hereto and made a part hereof as Exhibit B.  **See** Ex. B, Chai N.T., 02/19/2025, at 66.*

23.     On or about July 29, 2020, the Companies executed and delivered to TFSB a certain Bridge Note ("Note") evidencing a certain loan in the principal amount of $341,854.53 from TFSB to the Companies ("Loan").  *A true and correct copy of the Note is attached hereto and made a part hereof as Exhibit C.*

24.     As security for repayment of the Note, Bella Investment Properties made, executed, and delivered an Open-End Mortgage and Security Agreement ("Mortgage") to and in favor of TFSB upon certain real property owned by it and located at 1824 East Passyunk Avenue, Philadelphia, Pennsylvania 19148 ("Property").

25.     The Note allegedly authorized confession of judgment if a default occurred thereunder.  ***See id.***

26.     The Note requires, *inter alia*, that the Companies make payments of interest only beginning on September 1, 2020 until November 1, 2020 ("Maturity Date"), when all principal and any outstanding interest and other charges became due and payable. ***See id.***

27.     On July 29, 2020, Martorano executed and delivered to TFSB a certain Guaranty Agreement ("Guaranty") evidencing the guaranty of the Loan from TFSB to the Companies and which Guaranty allegedly authorized the entry of judgment if a default occurred thereunder. *A true and correct copy of the Guaranty is attached hereto and made a part hereof as Exhibit D.*

28.     At all times, the Loan was intended to be a short-term bridge loan to provide temporary financing while the issues created by TFSB and Innovative during the processing of the SBA loan – issues that were not the fault of Plaintiffs but which resulted in materially different terms than those sought – were addressed and corrected by TFSB and/or Innovative, which would allow the Loan to be replaced by the SBA loan with the terms promised.

29.     TFSB, however, never replaced the Loan with a SBA loan with the terms promised.

30.     TFSB's malfeasance continued through July 2021, when it finally got around to and finalized the Loan request, though by that time the opportunity for which Plaintiffs originally applied for the Loan was lost.

31.     Remarkably, even after finalizing the application, and obtaining SBA approval, TFSB wrongful conduct continued.  Though the SBA expressly approved the Companies' loan request as a 10-year loan at 4.25%, TFSB ignored the SBA's loan terms and instead offered to place the Companies into a five-year (5-year) term loan with interest at five-and-three-quarters percent (5.75%).

32.     At all points in time, the Companies made monthly payments under the Loan in good faith based on its understanding with and as represented by TFSB that the Loan would be

4916-8175-3399 v7

replaced with financing comparable to the SBA loan that would have been procured if not for the misconduct of TFSB and Innovative.

33.     This good faith was not reciprocated as, on November 18, 2024, TFSB filed a Complaint in Confession of Judgment against Plaintiffs in the Court of Common Pleas of Philadelphia County (Docket No. 241102256).

34.     Despite the Note having a Maturity Date of November 1, 2020, *see* Ex. C, TFSB did not file the Complaint in Confession of Judgment until November 18, 2024, and did not serve it on Plaintiffs until November 26, 2024 – over four (4) years later.

35.     Notably, TFSB did not file its Complaint in Confession of Judgment until after Plaintiffs filed a complaint against TFSB with the Federal Deposit Insurance Corporation ("FDIC"), raising claims substantially similar to those in the current complaint. *A true and correct copy of the confirmation of filing from the FDIC is attached hereto and made a part hereof as Exhibit E.*

36.     Plaintiffs believe and therefore aver that the Complaint in Confession of Judgment was filed purely in retaliation for the Companies' filing of the FDIC claim against TFSB and because Plaintiffs would not accede to TFSB's demand that they deposit significant amounts with TFSB.

37.     Specifically, TFSB's requirement for extending the bridge loan was that Defendants deposit cash in excess of the loan amount.

38.     The Complaint in Confession of Judgment sought to enforce loan terms that Plaintiffs only agreed to under duress and in reliance on representations from TFSB that those terms were a temporary accommodation until terms akin to those sought under the SBA loan program were obtained.

39.     Essentially, TFSB and Innovative represented that Plaintiffs would be able to obtain and SBA loan under the favorable terms of the SBA loan programs, then – either intentionally or negligently – mishandled the SBA loan application process, resulting in TFSB forcing the Companies into a bridge loan on terms unfavorable to the Companies and that all parties understood was to be a temporary solution until the errors of TFSB and Innovative were rectified.

40.     This, however, never happened, and instead TFSB is now actively attempting to enforce loan terms that it represented were always intended to be replaced by SBA loan terms and/or another loan with similar terms to those offered by the SBA.

## COUNT I
## Violation of Truth in Lending Act (TILA)
**Martorano v. All Defendants**

41.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

42.     The Truth in Lending Act ("TILA") requires creditors to meaningfully disclose credit terms.  *See* 15 U.S.C. § 1601(a) ("It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.").

43.     Here, Plaintiffs were initially informed by TFSB and Innovative that, per the SBA's guidelines, the Loan was to close within sixty (60) days, but, more than seven (7) months after the application was submitted, at the end of June 2020, processing of the Loan request was still not completed properly, leading to the bridge loan.

44.     Accordingly, TFSB failed to meaningfully disclose the time for closing the Loan in violation of the TILA.

45.    Additionally, the SBA's guidelines required the Loan to have an interest rate of no more than five percent (5%), with SBA ultimately approving an interest rate of four-and-a-quarter percent (4.25%), but the bridge loan had an interest rate of six percent (6%), and the loan TFSB offered to Plaintiffs following the bridge loan having an interest rate of five-and-three-quarters percent (5.75%).  Ex. B, Chai N.T., 02/19/2025, at 66.

46.    TFSB represented that this Loan was a temporary measure and that Plaintiffs would ultimately wind up with a loan that provided an interest rate comparable to that which was supposed to be the interest rate in the initially contemplated SBA loan and required under the Section 7(a) program.

47.    However, this never occurred, and TFSB and Innovative used this as a pretense to trap Plaintiffs into materially different and more onerous loan terms.

48.    Consequently, TFSB failed to properly and accurately disclose the interest rate to which Plaintiffs would be subject.

49.    Furthermore, though the SBA expressly approved the Loan request as a ten-year (10-year) loan, but TFSB issued a five-year (5-year) term loan.

50.    Utilizing loan terms not otherwise approved by the SBA reflects both a failure by TFSB to meaningfully disclose the term of the Loan and a violation of banking regulations.

51.    TFSB also failed to meaningfully disclose the confession of judgment clause, as it did not contain a separate signature line or even a space for initials immediately thereafter and, accordingly, was not signed under seal; it also does not appear in capital letters, in a larger font size, or in a different font style or color, and was not italicized nor underlined.  Ex. C.

52.    More importantly, TFSB did not attach nor did Plaintiffs execute a separate disclosure of confession of judgment form as required to enforce a confession of judgment clause. *See id.*

53.    TFSB further failed to meaningfully disclose the warrant of attorney, as it was not separate from the confession of judgment nor otherwise conspicuous, lacked a separate signature line, and is only mentioned twice within the larger confession of judgment clause, with one of those references only relating to the calculation of attorney fees. *Id.*; *see* Paragraph 20, *supra*.

54.    As a direct result of TFSB's and Innovative's failures and delays Plaintiffs suffered damages, including but not limited to:  (1) Plaintiffs lost business opportunity for which Plaintiffs originally applied for the Loan; (2) the Property is encumbered by a Mortgage; and (3) TFSB has unjustly filed a Complaint in Confession of Judgment against Plaintiffs for the full amount of Loan, as well as causing Plaintiffs to incur attorney fees and costs; (4) Plaintiffs entered into the Loan which was provided to Plaintiffs on demonstrably worse terms than the SBA loan for which they originally applied, but terms which were considerably more favorable to TFSB.

WHEREFORE, Plaintiff Linda R. Martorano pray that this Honorable Court grant judgment in their favor and against Defendants Tioga-Franklin Saving Bank and Innovative Financing & Consulting Group, LLC, d/b/a Innovative Financing Solutions, including the following relief:

a.    Declare the Loan and the Note null and void, so that Plaintiffs do not have to repay the Loan;

b.    Enjoin TFSB from foreclosing on the Mortgage;

c.    Award damages for the economic opportunities that Martorano lost during the months that TFSB took after the application date to approve the loan request;

d.    Award compensatory and punitive damages to Martorano in an amount in excess of $75,000;

e.    Award Martorano reasonable attorney fees and costs incurred in connection with this action; and

f.    Grant such other and further relief as this Court deems just and proper.

**COUNT II**
**<u>Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law</u>**
**<u>(UTPCPL)</u>**
**All Plaintiffs v. All Defendants**

55.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

56.    TFSB engaged in a range of deceptive business practices in violation of Section 201-2(4)(xxi) of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), the "catch-all" provision that prohibits "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201–2(4)(xxi).

57.    A plaintiff alleging a deceptive conduct claim must show:  (1) facts showing a deceptive act, that is conduct that is likely to deceive a consumer acting reasonably under similar circumstances; (2) justifiable reliance, meaning plaintiff justifiably engaged in some detrimental activity because of defendant's misrepresentation or deceptive conduct; (3) the justifiable reliance caused ascertainable loss. ***Vassalotti v. Wells Fargo Bank, N.A.***, 732 F. Supp. 2d 503, 510 (E.D. Pa. 2010); ***Seldon v. Home Loan Services, Inc.***, 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009).

58.    Here, TFSB and Innovative deceived Plaintiffs by enticing them with interest rates under five percent (5%) then ultimately trapping them into agreeing to interests of six percent (6%) for the bridge loan and five-and-three-quarter percent (5.75%) for the loan proposed by TFSB after the bridge loan. Ex. B, Chai N.T., 02/19/2025, at 66.

11

59.     TFSB and Innovative did so by falsely representing that this was a temporary measure and that Plaintiffs would ultimately wind up with a loan that provided an interest rate comparable to that which was supposed to be the interest rate in the initially contemplated SBA loan.

60.     In addition, TFSB and Innovative deceived Plaintiffs by enticing them with a much shorter timeframe for processing the loan than it was capable of providing – *i.e.*, Plaintiffs anticipated a sixty (60) day turnaround from application to approval, whereas TFSB and Innovative took nine times as long to approve the loan proposed by TFSB after the bridge loan.

61.     Plaintiffs relied upon TFSB's representations when they applied for a loan through TFSB.

62.     Moreover, the loan documents themselves contained insufficiently conspicuous confession of judgment and warrant of attorney clauses.  Ex. C.

63.     Plaintiffs relied upon these loan documents when agreeing to the bridge loan – which, again, they only did after TFSB's and Innovative's multitude of errors over more than seven (7) months left them in a precarious position, including TFSB and Innovative having "lost paperwork", improperly halting the processing of the application, and demanding production of the same information numerous times.

64.     Ultimately, TFSB deceived Plaintiffs into applying for a ten-year (10-year) loan, then bait-and-switched them by locking them into a five-year (5-year) loan.  ***Id.***

65.     Plaintiffs justifiably relied upon the terms of the SBA approvals and the other representations of TFSB and Innovative throughout the process.

66.     All of the above deceptive acts resulted in damages, including but not limited to: (1) by the time TFSB finalized the loan, the business opportunity for which Plaintiffs originally

applied for the Loan was lost; (2) the Property is encumbered by a Mortgage; and (3) TFSB has unjustly filed a Complaint in Confession of Judgment against Plaintiffs for the full amount of Loan, as well as causing TFSB to incur attorney fees and costs.

WHEREFORE, Plaintiffs Isabella Pizza Inc., Bella Investment Properties, LLC, and Linda R. Martorano pray that this Honorable Court grant judgment in their favor and against Defendants Tioga-Franklin Saving Bank and Innovative Financing & Consulting Group, LLC, d/b/a Innovative Financing Solutions, including the following relief:

      a.    Declare the Loan and the Note null and void, so that Plaintiffs do not have to repay the Loan;

      b.    Enjoin TFSB from foreclosing on the Mortgage;

      c.    Award damages for the economic opportunities that Plaintiffs lost during the months that TFSB took after the application date to approve the loan request;

      d.    Award compensatory and punitive damages to Plaintiffs in an amount in excess of $75,000;

      e.    Award Plaintiffs their reasonable attorney fees and costs incurred in connection with this action; and

      f.    Grant such other and further relief as this Court deems just and proper.

**COUNT III**
**<u>Fraudulent Inducement</u>**
**All Plaintiffs v. All Defendants**

67.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

68.    Fraudulent inducement requires a plaintiff to prove six elements:

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

13

(4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Seguro Medico, LLC v. Humphreys*, 313 A.3d 298, 312 (Pa. Cmwlth.), *reargument denied*

(Feb. 1, 2024), *aff'd*, 320 A.3d 1163 (Pa. 2024).

69.     Here, Defendants made misrepresentations to Plaintiffs by enticing them with interest rates under five percent (5%) then ultimately hitting them with interests of six percent (6%) for the bridge loan and five-and-three-quarter percent (5.75%) for the loan proposed by TFSB after the bridge loan and by enticing them with a much shorter timeframe for processing the loan than they were capable of providing – i.e., Plaintiffs anticipated a sixty (60) day turnaround from application to approval, whereas TFSB took nine times as long to approve the loan proposed by TFSB after the bridge loan.  Ex. B, Chai N.T., 02/19/2025, at 66.

70.     The representations were material to the transaction at issue as Plaintiffs would never have entered into the Loan and the Note without Defendants' representations that interest rates would be under five percent (5%) and that their application would be approved within sixty (60) days.

71.     In fact, Plaintiffs would never have pursued the Loan and the Note without having justifiably relied upon Defendants' misrepresentations about the interest rates and the anticipated approval timeframe.  *See Patel v. Kandola Real Estate, LP*, 271 A.3d 421, 427 (Pa. Super. 2021) ("Pennsylvania has adopted the 'justifiable reliance' standard set forth in Sections 540 and 541 of the Restatement (Second) of Torts and recognizes 'that the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely'").

72.     It is believed and therefore averred that Defendants acted with the intent to mislead Plaintiffs into relying upon their misrepresentations in order to induce Plaintiffs to enter into the

Loan and Note, which they would not have done had they known that Defendants would not be honoring their proposed interest rate and application approval schedule.

73.    Given Defendants' professional obligations and fiduciary duties, Plaintiffs' reliance on Defendants' representations was justifiable.

74.    Defendants' actions caused damages to Plaintiffs, including but not limited to: (1) by the time TFSB finalized the loan, the business opportunity for which Plaintiffs originally applied for the Loan was lost; (2) the Property is encumbered by a Mortgage; and (3) TFSB has unjustly filed a Complaint in Confession of Judgment against Plaintiffs for the full amount of Loan, as well as causing TFSB to incur attorney fees and costs.

WHEREFORE, Plaintiffs Isabella Pizza Inc., Bella Investment Properties, LLC, and Linda R. Martorano pray that this Honorable Court grant judgment in their favor and against Defendant Tioga-Franklin Saving Bank and Innovative Financing & Consulting Group, LLC, d/b/a Innovative Financing Solutions, including the following relief:

a.    Declare the Loan and the Note null and void, so that Plaintiffs do not have to repay the Loan;

b.    Enjoin TFSB from foreclosing on the Mortgage;

c.    Award damages for the economic opportunities that Plaintiffs lost during the months that TFSB took after the application date to approve the loan request;

d.    Award compensatory and punitive damages to Plaintiffs in an amount in excess of $75,000;

e.    Award Plaintiffs their reasonable attorney fees and costs incurred in connection with this action; and

f.    Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs Isabella Pizza Inc., Bella Investment Properties, LLC, and Linda R. Martorano demand a trial by jury under Fed. R. Civ. P. 38 for all issues so triable.

Respectfully submitted,

**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**

_____
Andrew S. Kasmen, Esquire (#58926)
Brooke E. Newborn, Esquire (#209732)
Matthew Olesh, Esquire (#206553)
*Counsel for Plaintiffs Isabella Pizza Inc., Bella Investment Properties, LLC, and Linda R. Martorano*

Dated: June 27, 2025

16

**EXHIBIT A**



# IFS CONSULTING SERVICES ENGAGEMENT AGREEMENT

Whereas, Linda Martorano, Individually and Isabella Pizza, Inc. (Operating Company "OC") and Bella Investment Properties, LLC (Eligible Passive Company "EPC") hereinafter referred to as the "Borrower", wishes to secure conventional, alternative, and/or government guaranteed financing, and,

Whereas, Innovative Financing & Consulting Group, LLC t/a Innovative Financing Solutions, hereinafter referred to as "Consultant", specializes in arranging conventional, alternative, and government-guaranteed financing, and,

Whereas, Consultant is prepared to assist Borrower, subject to the terms and conditions herein outlined,

Now, therefore, in consideration of the covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Borrower and Consultant hereby agree as follows:

1. **Terms of Engagement**

    This Agreement represents a Limited Agency Engagement whereby Borrower engages Consultant as its exclusive financing agent for the limited purposes herein outlined. Consultant is hereby authorized and instructed, upon execution of this Agreement, to assist Borrower with Loan Packaging services.

2. **Application Processing & Submission**

    If deemed eligible, and all proposed loan rates, terms, and conditions are refined and approved by Borrower and Lender, Consultant shall immediately thereafter facilitate completion of a comprehensive SBA Application, within ten (10) business days upon receipt of <u>ALL</u> required documentation from Borrower, as set forth in a separate Application Documentation Checklist to be provided by Consultant.

    While neither Borrower nor Consultant have control of the Lender and/or Government Agency's internal processing of the Application, it is expressly acknowledged that Time Is of The Essence on behalf of Borrower and Consultant in establishing final Lender and/or Government Agency approval through the Application process herein outlined.



3.  **Consultant Fees**

    Loan Packaging Fee
    The Borrower acknowledges Consultant's considerable up-front time and business expense investments necessary in providing loan application packaging services which include assistance with completing Borrower application forms, preparing a business plan, preparing cash flow projections, and other documents related to the application.  In recognition, the Borrower agrees to pay consultant a packaging fee of $2,500.00 upon execution of this Agreement.  Said fee is charged at a rate of $250.00 per hour. Should the loan fail to close for any reason, Consultant shall itemize all hours and provide a final invoice based on the stated hourly rate, not to exceed $2,500.00. Borrower shall be refunded the difference between the Invoice and Packaging Fee amount should the Invoice be less than $2,500.00.

    The Applicant is not required to employ Consultant or a representative of the SBA Lender (including the SBA Lender) to assist the Applicant with SBA Loan Application Packaging Services and is not required to pay for unwanted services. By initialing below, Borrower acknowledges the fee is reasonable and payment of said fee is not contingent upon loan approval.

    *Borrower Initials:* 

4.  **Lender Service Provider Fees**
    Consultant may have an existing contractual SBA Lender Service Provider Agreement (LSPA) with certain Client Lenders, who may separately and directly pay Consultant a fee under the Agreement subject to the terms and conditions of the LSPA.  No portion of this fee is collected from or passed through to the Borrower.

5.  **Guarantee Percentage, Loan Limit, & Fees**
    For the benefit of the maximum Government Guaranty the Government Agency charges a one-time fee based upon a percentage of the guaranteed portion of the loan amount, or total loan amount, up to the maximum qualifying loan amount.  For example, based on a loan aggregate amount of $350,000 the guarantee fee will be approximately $5,250.  The Guarantee Fees are generally financed with loan proceeds.

6.  **Loan Terms**
    Loan Terms vary by the Government Guaranty program utilized (USDA, SBA, or others). SBA Loan Terms for example are as follows:  The maximum qualifying term for the purchase and/or construction of owner-occupied business real estate is twenty-five (25) years. The maximum qualifying term for business acquisition is (10) years. The maximum qualifying SBA term for working capital is the lesser of (a) the term necessary to service the debt, or (b) ten (10) years.  If a loan is comprised of two or more categories, then a weighted-average term calculation may be utilized based on the use of proceeds.  The loan term may also be established based on the maximum term permitted for the asset class comprising 51% or more of the use of proceeds.



7. **Interest Rates & Prepayments**

   Interest rate and prepayment terms vary by the Government Guaranteed program and are generally negotiable with the Lender. For USDA and SBA loans, since the loan terms cannot contain balloon provisions, the interest rate, which is fully negotiable between the Borrower and Lender, is typically on a variable rate basis and by regulatory requirement, tied to a published index (typically Wall Street Journal Prime which is currently 4.75%), which can change no more often than quarterly. The SBA imposes an interest rate Spread not to exceed 2.75% (currently 7.50%). The SBA limits Prepayment Penalties to 5/3/1 for loans with a maturity exceeding 15 years.

8. **Loan Application, Approval, and Closing Process**

   The Loan Application process entails assistance with the preparation of all Application requirements, as herein outlined.

   It is expressly understood there is no representation or commitment on behalf of the Consultant, Lender or Government Agency to approve or fund the completed application. The Lender may issue a conditional commitment which is subject to final Government Agency approval. Further, it is possible that review of subsequent clarifications and/or submitted documentation, on behalf of Consultant and/or the Government Agency may render a Borrower ineligible for government-guaranteed funding, who, based upon the initial facts, was previously considered eligible. If material eligibility or underwriting concerns or disparities are identified in the application process, the application may be terminated, or revised terms and conditions set forth, in compliance with Government Agency eligibility and underwriting guidelines.

   Upon execution and return of this Agreement, Consultant shall prepare and present Borrower with a comprehensive Documentation Checklist, Worksheets, and Forms, necessary in determining SBA Eligibility and Application requirements. This shall include all required application forms, organizational documents, business financials, guarantor financials, personal and corporate income tax returns, supporting schedules, and other information as required. Thereafter, Consultant will coordinate with the Borrower and/or Borrower's representatives, in the compilation, review, and refinement of the documents.

   Packaging Services are limited to the above referenced services stated within paragraph 3 above.

   The following services are completed by Consultant on behalf of the Lender under an approved Lender Service Provider Agreement or will be completed by Consultant on behalf of Borrower if the transaction is approved and funded by a IFS Non-Client Lender.

   Upon completion of Consultant's review and refinement of all Borrower submitted documentation, and analysis of all submitted financial information, Consultant shall prepare and submit the Financing Package and Application to Lender and/or Government Agency. Borrower shall have the right to review the Financing Package prior to Lender submission if the transaction is completed through an IFS Non-Client Lender. The loan package shall include a detailed Financing Memorandum, which will outline a Summary of the Financing Request, with an evaluation of the Capital Adequacy, Business and Global Debt Service Capacity, Collateral Coverage, and Guarantor Strength of the Borrower, together with Pro Forma Financials,



Operating Projections, R.M.A. Industry Average Comparisons, Financial Ratio Analysis, and Financial Statement Spreads and Recommended Loan Conditions.

Once the Application is fully completed, a final credit decision on behalf of the Lender, to either approve or deny the Application is made, as submitted or with expressed conditions. At this time, a written notice of denial or approval will be issued by Lender. Upon final Lender approval, the Letter of Commitment or Loan Approval Document will be forwarded to the Government Agency, subject to satisfactory review and acceptance.

Once approved by Lender, the Application is then submitted to the Government Agency for final agency processing, which will then either be denied or approved. If approved, a written Loan Authorization and Guarantee Agreement is then issued. Borrower acknowledges that only a written Letter of Commitment or Loan Approval Document on behalf of the Lender, accompanied by a written Loan Authorization & Guarantee Agreement, constitutes application approval, under the terms and conditions outlined in each.

Upon receipt of the Loan Authorization & Guarantee Agreement, loan closing requirements may then be coordinated and a closing scheduled.

9. **Borrower Covenants**
The Borrower commits to complying with any legitimate request for financial and supporting information, documentation, or due diligence reports (independent business valuation, real estate appraisals, environmental assessments, etc.), absent reasonable cause. Further, Borrower warrants and represents to and covenants with Consultant that:

a) All supporting documentation submitted to Consultant shall be genuine and that all names, addresses, amounts, dates, signatures and other statements contained therein shall be true and correct to the best of Borrower's knowledge.

b) Borrower has the full legal right, power, and authority to execute this agreement and to consummate all of the actions contemplated by this agreement.

10. **Arbitration of Disputes**
The parties hereby agree to submit any dispute or controversy, at law or in equity, to binding arbitration under the Rules of the American Arbitration Association. Said dispute(s) shall be heard in Delaware County in the State of Pennsylvania. The prevailing party shall be entitled to legal costs and fees, arbitration costs and arbitrator's fees. In the event that legal action becomes necessary to confirm and/or collect the award of the arbitrator, the prevailing party in arbitration shall be entitled to reasonable attorney's fees for post-arbitration action. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

11. **Consultant Promises Due Diligence**
In consideration of the Borrower's above written assurances, Consultant promises to use diligence in all efforts on Borrower's behalf. Consultant understands and appreciates that Time is of The Essence to the Borrower, and shall adhere to all scheduled meetings, and scheduled processing time frames.

12. **Counterparts**

This Agreement may be executed in any number of counterparts, each of which, taken together, shall constitute one and the same agreement. Faxed or electronically delivered signatures shall be enforceable as original signatures against the party delivering such signatures.

13. **Governing Law**

This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

It is hereby acknowledged that the undersigned has read, understand, and agrees with, the terms and conditions of this Agreement, as contained herein.

Isabella Pizza, Inc.

_____      12/17/2019
Linda Martorano, President                    Date

Bella Investment Properties, LLC

_____      12/17/2019
Linda Martorano, ~~President~~ (by            Date
Managing Member

Innovative Financing Solutions

_____
                                                          12-12-19
_____      _____
Michael D. Ryan, Managing Member              Date

**A signed facsimile or e-mail copy of this Agreement shall be considered an original copy and will be considered legal and binding.**

# **EXHIBIT B**

Irvin Chai
February 19, 2025

1    with that and provide this bridge note without his

2    guaranty.

3    Q.    And what's the interest rate on the bridge

4    note?

5    A.    I believe it's six percent.

6    Q.    What was the interest rate to be provided

7    under the SBA loan?

8    A.    Prime plus one percent adjustable rate.

9    Q.    At that time, do you know what rate it would

10    have been?

11    A.    Four and a quarter.

12    Q.    How come the bank wasn't able to give that

13    rate under the bridge note?

14    A.    The bridge note was a fixed rate loan and

15    the SBA loan is an adjustable or variable rate loan.

16    Q.    It says, After the note, guaranty, and

17    related note documents were executed, however, the

18    defendant informed the bank of a change in plans

19    with the mortgaged property.

20         Who informed the bank of a change in plans

21    with the mortgaged property?

22    A.    My knowledge of that was from a memo

23    prepared by Caroline Barber with regards to the

24    change in plans.

25    Q.    What did the memo say with respect to the

# EXHIBIT C

## BRIDGE NOTE

**$341,854.53**                                                                **July 29, 2020**

**FOR VALUE RECEIVED**, Isabella Pizza Inc and Bella Investment Properties, LLC, jointly and severally (collectively the **"Borrower"**), with an address at 3243 S. Chaucer Street, Philadelphia, PA 19145, promises to pay to the order of **Tioga-Franklin Savings Bank** (the **"Bank"**), in lawful money of the United States of America in immediately available funds at its offices located at 320 E. Girard Avenue, Philadelphia, PA 19125, or at such other location as the Bank may designate from time to time, the principal sum of **Three Hundred Forty One Thousand Eight Hundred Fifty Four and 53/100 Dollars ($341,854.53)** (the **"Facility"**) or such lesser amount as may be advanced to or for the benefit of the Borrower hereunder, together with interest accruing on the outstanding principal balance from the date hereof, as provided below:

**Rate of Interest.** Interest shall accrue on the outstanding balance of the Note at a fixed rate equal to six percent (6.00%) per annum.

**Payment Terms.** Accrued interest will be due and payable on the first (1st) day of each month, beginning with the payment due on September 1, 2020. The outstanding principal balance and any accrued but unpaid interest shall be due and payable on November 1, 2020 (the "Maturity Date").

If any payment under this Note shall become due on a Saturday, Sunday or public holiday under the laws of the State where the Bank's office indicated above is located, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest in connection with such payment. The Borrower hereby authorizes the Bank to charge the Borrower's deposit account at the Bank for any payment when due hereunder. Payments received will be applied to charges, fees and expenses (including attorneys' fees), accrued interest and principal in any order the Bank may choose, in its sole discretion.

The Borrower hereby authorizes the Bank to automatically deduct from any deposit account of the Borrower the amount of any loan payment including all payments of interest, principal and other sums due ("Automatic Payment"), from time to time, under this Note; the Bank will thereafter notify the Borrower of the amount so charged. If the funds in the account are insufficient to cover any payment due, the Bank shall not be obligated to advance funds to cover the payment. The failure of the Bank so to charge any account or to give any such notice shall not affect the obligation of the Borrowers to pay interest, principal or other sums as provided herein or in any Note. At any time and for any reason, the Borrower or the Bank may voluntarily terminate the Automatic Payment. Termination by the Borrower of the Automatic Payment must be made by written notice to the Bank.

00790163-2

**Late Payments; Default Rate.** If the Borrower fails to make any payment of principal, interest or other amount coming due pursuant to the provisions of this Note within ten (10) calendar days of the date due and payable, the Borrower also shall pay to the Bank a late charge equal to the greater of (i) seven percent (7.0%) of Borrower's overdue payment or (ii) $25.00. (the "Late Charge"). Such ten (10) day period shall not be construed in any way to extend the due date of any such payment. Upon maturity, whether by acceleration, demand or otherwise, and at the Bank's option upon the occurrence of any Event of Default (as hereinafter defined) and during the continuance thereof, this Note shall bear interest at a rate per annum (based on a year of 360 days and actual days elapsed) which shall be five (5) percentage points (5.0%) in excess of the interest rate in effect from time to time under this Note but not more than the maximum rate allowed by law (the **"Default Rate"**). The Default Rate shall continue to apply whether or not judgment shall be entered on this Note. Both the Late Charge and the Default Rate are imposed as liquidated damages for the purposes of defraying the Bank's expenses incident to the handling of delinquent payments, but are in addition to, and not in lieu of, the Bank's exercise of any rights and remedies hereunder, under the other Loan Documents or under applicable law, and any fees and expenses of any agents or attorneys which the Bank may employ. In addition, the Default Rate reflects the increased credit risk to the Bank of carrying a loan that is in default. The Borrower agrees that the Late Charge and Default Rate are reasonable forecasts of just compensation for anticipated and actual harm incurred by the Bank, and that the actual harm incurred by the Bank cannot be estimated with certainty and without difficulty.

**Prepayment.** The Facility may be prepaid, in whole or in part, without premium or penalty.

**Other Loan Documents.** This Note is issued in connection with a letter agreement or loan agreement between the Borrower and the Bank dated on or before the date hereof, and the other agreements and documents executed in connection therewith or referred to therein, the terms of which are incorporated herein by reference (as amended, modified or renewed from time to time, collectively the **"Loan Documents"**), and is secured by the property described in the Loan Documents (if any) and by such other collateral as previously may have been or may in the future be granted to the Bank to secure this Note.

**Events of Default.** The occurrence of any of the following events will be deemed to be an **"Event of Default"** under this Note: (i) the nonpayment of any principal, interest or other indebtedness under this Note when due; (ii) the occurrence of any event of default or default and the lapse of any notice or cure period under any Loan Document or any other debt, liability or obligation to the Bank of any Obligor; (iii) the filing by or against any Obligor of any proceeding in bankruptcy, receivership, insolvency, reorganization, liquidation, conservatorship or similar proceeding (and, in the case of any such proceeding instituted against any Obligor, such proceeding is not dismissed or stayed within 30 days of the commencement thereof, provided that the Bank shall not be obligated to advance additional funds during such period); (iv) any assignment by any Obligor for the benefit of creditors, or any levy, garnishment, attachment or similar proceeding is instituted against any property of any Obligor held by or deposited with the Bank; (v) a default with respect to any other indebtedness of any Obligor for borrowed money, if the effect of such default is to cause or permit the acceleration of such debt; (vi) the commencement of any foreclosure or forfeiture proceeding, execution or attachment against any collateral securing the obligations of any Obligor to the Bank; (vii) the entry of a final judgment

against any Obligor and the failure of such Obligor to discharge the judgment within ten days of the entry thereof; (viii) if this Note or any guarantee executed by any Guarantor is secured, the failure of any Obligor to provide the Bank with additional collateral if in the Bank's opinion at any time or times, the market value of any of the collateral securing this Note or any guarantee has depreciated below that required pursuant to the Loan Documents (if any) or, if no specific value is so required, then in an amount deemed material by the Bank; (ix) any material adverse change in any Obligor's business, assets, operations, financial condition or results of operations; (x) any Obligor ceases doing business as a going concern; (xi) the revocation or attempted revocation, in whole or in part, of any guarantee by any Guarantor; (xii) the death, incarceration, indictment or legal incompetency of any individual Obligor or, if any Obligor is a partnership or limited liability company, the death, incarceration, indictment or legal incompetency of any individual general partner or member; (xiii) any representation or warranty made by any Obligor to the Bank in any Loan Document, or any other documents now or in the future evidencing or securing the obligations of any Obligor to the Bank, is false, erroneous or misleading in any material respect; or (xiv) any Obligor's failure to observe or perform any covenant or other agreement with the Bank contained in any Loan Document or any other documents now or in the future evidencing or securing the obligations of any Obligor to the Bank. As used herein, the term **"Obligor"** means any Borrower and any Guarantor, and the term **"Guarantor"** means any guarantor of the Borrower's obligations to the Bank existing on the date of this Note or arising in the future.

Upon the occurrence of an Event of Default: (a) the Bank shall be under no further obligation to make advances hereunder; (b) if an Event of Default specified in clause (iii) or (iv) above shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder shall be immediately due and payable without demand or notice of any kind; (c) if any other Event of Default shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder, at the Bank's option and without demand or notice of any kind, may be accelerated and become immediately due and payable; (d) at the Bank's option, this Note will bear interest at the Default Rate from the date of the occurrence of the Event of Default; and (e) the Bank may exercise from time to time any of the rights and remedies available under the Loan Documents or under applicable law.

**Right of Setoff.** In addition to all liens upon and rights of setoff against the Borrower's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Borrower's obligations to the Bank under this Note and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Borrower hereby assigns, conveys, delivers, pledges and transfers to the Bank all of the Borrower's right, title and interest in and to, all of the Borrower's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of Wilmington Savings Fund Society, FSB, whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Borrower. Every such right of setoff shall be deemed to have been exercised

immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

## POWER TO CONFESS JUDGMENT

The Borrower hereby empowers any attorney of any court of record, after the occurrence of any Event of Default hereunder, to appear for the Borrower and, with or without complaint filed, confess judgment, or a series of judgments, against the Borrower in favor of the Bank or any holder hereof for the entire principal balance of this Note, all accrued interest and all other amounts due hereunder, together with costs of suit and an attorney's commission of the greater of 10% of such principal and interest or $1,000 added as a reasonable attorney's fee, and for doing so, this Note or a copy verified by affidavit shall be a sufficient warrant. The Borrower hereby forever waives and releases all errors in said proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted. Interest on any such judgment shall accrue at the Default Rate.

No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as the Bank shall elect until such time as the Bank shall have received payment in full of the debt, interest and costs. Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that the Bank may recover from the Borrower shall not exceed the actual attorneys' fees incurred by the Bank.

NOTICE: If this Note includes any provision which is deemed to be a power of attorney subject to Section 5601.3 of Chapter 56 of the Pennsylvania Probate, Estates and Fiduciaries Code (a "POA Provision"), each POA Provision is hereby modified to include an irrevocable waiver by each principal of the agent's duties set forth in Section 5601.3(b) of said chapter. Without further modifying any POA Provision, the Undersigned hereby acknowledges that in view of the commercial nature of the relationship between the parties hereto, there is no expectation that the agent shall have a duty under any POA Provision to act in the best interest of any principal thereunder, and it is agreed that the agent shall have no such duty.

Miscellaneous. All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing (except as may be agreed otherwise above with respect to borrowing requests) and will be effective upon receipt. Such notices and other communications may be hand-delivered, sent by facsimile transmission with confirmation of delivery and a copy sent by first-class mail, or sent by nationally recognized overnight courier service, to the addresses for the Bank and the Borrower set forth above or to such other address as either may give to the other in writing for such purpose. No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any

such right or power. No modification, amendment or waiver of any provision of this Note nor consent to any departure by the Borrower therefrom will be effective unless made in a writing signed by the Bank. The Borrower agrees to pay on demand, to the extent permitted by law, all costs and expenses incurred by the Bank in the enforcement of its rights in this Note and in any security therefor, including without limitation reasonable fees and expenses of the Bank's counsel. If any provision of this Note is found to be invalid by a court, all the other provisions of this Note will remain in full force and effect. The Borrower and all other makers and indorsers of this Note hereby forever waive presentment, protest, notice of dishonor and notice of non-payment. The Borrower also waives all defenses based on suretyship or impairment of collateral. If this Note is executed by more than one Borrower, the obligations of such persons or entities hereunder will be joint and several. This Note shall bind the Borrower and its heirs, executors, administrators, successors and assigns, and the benefits hereof shall inure to the benefit of the Bank and its successors and assigns; provided, however, that the Borrower may not assign this Note in whole or in part without the Bank's written consent and the Bank at any time may assign this Note in whole or in part.

This Note has been delivered to and accepted by the Bank and will be deemed to be made in the Commonwealth of Pennsylvania. THIS NOTE WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE BORROWER DETERMINED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, EXCLUDING ITS CONFLICT OF LAWS RULES. The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in the County of Philadelphia, Pennsylvania; provided that nothing contained in this Note will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction. The Borrower acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Borrower. The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Note.

WAIVER OF JURY TRIAL. THE BORROWER IRREVOCABLY WAIVES ANY AND ALL RIGHTS THE BORROWER MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS NOTE, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS NOTE OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

The Borrower acknowledges that it has read and understood all the provisions of this Note, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.

REST OF PAGE LEFT INTENTIONALLY BLANK
Signatures on Separate Page

<u>Signature Page of Note</u>

**WITNESS** the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

WITNESS:

_As to All_

**Isabella Pizza Inc.** Borrower

By: _____

Name: Linda R. Martorano
Title: President

**Bella Investment Properties, LLC,** Borrower

By: _____

Name: Linda R. Martorano
Title: Sole Member

0079016
3-2

# **EXHIBIT D**

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT is executed July 29, 2020 by **Linda R. Martorano** (the "Guarantor[s]"), with an address at 3243 S. Chaucer Street, Philadelphia, PA 19145, in consideration of the extension loans and other credit accommodation by Tioga-Franklin Savings Bank (the "Bank"), with an address at 320 E. Girard Avenue, Philadelphia, PA 19125, to **Isabella Pizza Inc** and **Bella Investment Properties, LLC** (collectively the "Borrower"), and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

1.   **Guaranty.**   The undersigned Guarantor hereby guarantees the prompt payment and performance of all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document, whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, under any interest or currency swap, future, option or other interest rate protection or similar agreement, or in any other manner, whether arising out of overdrafts on deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Bank's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, and any amendments, extensions, renewals or increases and all costs and expenses of the Bank incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses (hereinafter referred to collectively as the **"Obligations"**). If the Borrower defaults under any such Obligations, the Guarantor will pay the amount due to the Bank.

2.   **Guaranty Absolute and Unconditional.**   The liability of the Guarantor under this Guaranty is absolute and unconditional irrespective of:

   2.1.   any lack of validity or enforceability of any of the Loan Documents;

   2.2.   any change in the time, manner, place or amount of payment or in any other term of all or any of the Indebtedness, or any other amendment or waiver of or any consent to departure from any of the terms of the Indebtedness;

2.3. any exchange, release or non-perfection of any collateral or lien securing all or any part of the Indebtedness, which exchange, release or non-perfection the Guarantor expressly agrees will not be deemed an unjustifiable impairment of the collateral;

2.4. any release or amendment or waiver of or consent to departure from any other guaranty, for all or any part of the Indebtedness;

2.5. any settlement or compromise with any Borrower or any other person relating to the Indebtedness; or

2.6. any other circumstances which might otherwise constitute a defense available to, or a discharge of, any Borrower, any guarantor or other obligor in respect of the Indebtedness or the Guarantor in respect of this Guaranty.

This Guaranty is a continuing guarantee and shall remain in full force and effect until all of the Indebtedness has been paid in full and will continue to be effective, or be reinstated, as the case may be, if at any time any of the Indebtedness is rescinded, avoided or rendered void or must otherwise be returned by the Bank for any reason, including, without limitation, the insolvency or bankruptcy of any Borrower, the Guarantor or otherwise, all as though such payment had not been made.

3.     **Waiver.**   This is an absolute, unconditional, irrevocable and continuing guaranty and will remain in full force and effect until all of the Obligations have been indefeasibly paid in full, and the Bank has terminated this Guaranty. This Guaranty will remain in full force and effect even if there is no principal balance outstanding under the Obligations at a particular time or from time to time. This Guaranty will not be affected by any surrender, exchange, acceptance, compromise or release by the Bank of any other party, or any other guaranty or any security held by it for any of the Obligations, by any failure of the Bank to take any steps to perfect or maintain its lien or security interest in or to preserve its rights to any security or other collateral for any of the Obligations or any guaranty, or by any irregularity, unenforceability or invalidity of any of the Obligations or any part thereof or any security or other guaranty thereof. The Guarantor's obligations hereunder shall not be affected, modified or impaired by any counterclaim, set-off, deduction or defense based upon any claim the Guarantor may have against the Borrower or the Bank, except payment or performance of the Obligations. The Guarantor hereby waives (a) promptness and diligence; (b) notice of incurring any Indebtedness by the Borrower; (c) notice of any actions taken by the Bank or the Borrower under any Loan Document; (d) acceptance of this Guaranty and reliance thereon by the Bank; (e) presentment, demand of payment, notice of dishonor or nonpayment, protest and notice of protest with respect to the Indebtedness, and all other formalities of every kind in connection with the enforcement of the Indebtedness or of the obligations of Guarantor hereunder or of any other guarantor, the omission of or delay in which, but for the provisions hereof, might constitute grounds for relieving Guarantor of the obligations

hereunder; (f) any requirement that the Bank protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action against the Borrower, the Guarantor, any other person or any collateral; and (g) notice of any election by the Bank to sell any of the property mortgaged, assigned or pledged as security for any of the Indebtedness at a public or private sale.

4.  **Voided Repayments.**  If any demand is made at any time upon the Bank for the repayment or recovery of any amount received by it in payment or on account of any of the Obligations and if the Bank repays all or any part of such amount by reason of any judgment, decree or order of any court or administrative body or by reason of any settlement or compromise of any such demand, the Guarantor will be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never been received originally by the Bank.  The provisions of this section will be and remain effective notwithstanding any contrary action which may have been taken by the Guarantor in reliance upon such payment, and any such contrary action so taken will be without prejudice to the Bank's rights hereunder and will be deemed to have been conditioned upon such payment having become final and irrevocable.

5.  **Subrogation, Reimbursement and Indemnity.**  The Guarantor waives (a) all right to seek reimbursement, indemnity or contribution from the Borrower, and (b) any right to subrogation it may have or acquire as result of performance under this Guaranty.  If, notwithstanding such waiver, any amount shall be paid to the Guarantor on account of such subrogation, indemnification or contribution at any time when the Indebtedness has not been paid in full, such amount shall be held in trust for the benefit of the Bank, shall be segregated from the other funds of Guarantor and shall forthwith be paid over to the Bank to be applied in whole or in part by the Bank against the Indebtedness, whether matured or unmatured, in accordance with the Loan Documents.

6.  **Financial Statements.**  Unless compliance is waived in writing by the Bank or until all of the Obligations have been paid in full, the Guarantor will promptly submit to the Bank such information relating to the Guarantor's affairs (including but not limited to annual financial statements and tax returns for the Guarantor) or any security for the Guaranty as the Bank may reasonably request.

    In the event that any such information submitted to the Bank has been prepared by an outside accountant, the same shall be accompanied by a statement in writing signed by the accountant disclosing that the accountant is aware that the information prepared by the accountant would be submitted to and relied upon by the Bank in connection with the Bank's determination to grant or continue credit.

7.  **Costs.**  To the extent that the Bank incurs any costs or expenses in protecting or enforcing its rights under the Obligations or this Guaranty, including reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be

due on demand, will be included in the Obligations and will bear interest from the incurring or payment thereof at the Default Rate (as defined in any of the Obligations).

8.    <u>Notices.</u>  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and will be effective upon receipt. Such notices and other communications may be hand-delivered, sent by facsimile transmission with confirmation of delivery and a copy sent by first-class mail, or sent by nationally recognized overnight courier service, to the addresses for the Bank and the Guarantor set forth above or to such other address as one may give to the other in writing for such purpose.

9.    <u>Preservation of Rights.</u>  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.  The Bank may proceed in any order against the Borrower, the Guarantor or any other obligor of, or collateral securing, the Obligations.

10.   <u>Illegality.</u>  In case any one or more of the provisions contained in this Guaranty should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

11.   <u>Right of Set-off; Security Interest.</u>  Upon the occurrence of an Event of Default, the Bank is authorized at any time, without notice to the Guarantor, to set off and apply to any unpaid Indebtedness:  (a) any amounts which the Bank from time to time may owe the Guarantor, including any balance or share of any general or special deposit, certificate of deposit, savings certificate or other account (regardless of the source or intended use of any funds in such account); and (b) any other property, tangible or intangible, owned by or in which the Guarantor has an interest which may be in the possession or control of the Bank, in which accounts and other property Guarantor grants the Bank a security interest. This right is in addition to and not in limitation of any other rights, including of set-off, which the Bank may have by law.

12.   <u>**Power to Confess Judgment.  The Guarantor hereby empowers any attorney of any court of record, after the occurrence of any Event of Default hereunder, to appear for the Guarantor and, with or without complaint filed, confess judgment, or a series of judgments, against the Guarantor in favor of the Bank for the amount of the Obligations and an attorney's commission of the greater of 10% of such principal and interest or $1,000 added as a reasonable attorney's fee, and for doing so, this Guaranty or a copy verified by affidavit shall be a sufficient warrant. The Guarantor hereby forever waives and releases all errors in said proceedings and all**</u>

rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted.

No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as the Bank shall elect until such time as the Bank shall have received payment in full of the Obligations and costs. Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that the Bank may recover from the Guarantor shall not exceed the actual attorneys' fees incurred by the Bank.

NOTICE: If this Guaranty includes any provision which is deemed to be a power of attorney subject to Section 5601.3 of Chapter 56 of the Pennsylvania Probate, Estates and Fiduciaries Code (a "POA Provision"), each POA Provision is hereby modified to include an irrevocable waiver by each principal of the agent's duties set forth in Section 5601.3(b) of said chapter. Without further modifying any POA Provision, the Undersigned hereby acknowledges that in view of the commercial nature of the relationship between the parties hereto, there is no expectation that the agent shall have a duty under any POA Provision to act in the best interest of any principal thereunder, and it is agreed that the agent shall have no such duty.

13.    **Continuing Guaranty; Assignment.** This Guaranty is a continuing guaranty and will: (a) be binding upon the Guarantor, its successors and assigns; and (b) inure to the benefit of and be enforceable by the Bank and its successors, transferees and assigns; provided, however, that the Guarantor can not assign this Guaranty without the prior written consent of the Bank.

14.    **Guaranty Not Modified by Bankruptcy.** Neither the Guarantor's obligation in accordance with the terms of this Guaranty, nor any remedy for the enforcement, nor the amount of the Indebtedness of the Borrower will be impaired, modified, or limited in any manner whatsoever by any impairment, modification, discharge or limitation of the Indebtedness of the Borrower or its estate in bankruptcy or any remedy for the enforcement, resulting from the operation of any present or future provision of the Bankruptcy Code of the United States or other statute, or from the decision of any court interpreting any of the same. The amount of the Indebtedness will, for the purposes of this Guaranty, be determined as if no such impairment, stay, modification, discharge or limitation had occurred.

15.    **Consent To Jurisdiction; Service of Process.** In the event the Bank brings any action hereunder in any court of record of the state governing this Guaranty, the Guarantor consents to and confers personal jurisdiction over the Guarantor by such court or courts

and agrees that service of process may be made upon the Guarantor by mailing a copy of such process to Guarantor.

16.    **Waiver of Jury Trial.** GUARANTOR WAIVES TRIAL BY JURY IN ANY ACTION UNDER OR RELATING TO THIS GUARANTY AND TO THE INDEBTEDNESS OF THE BORROWER TO THE BANK.

17.    **Governing Law.** This Guaranty will be governed by, and construed in accordance with, the laws of the State of Pennsylvania.

18.    **Indemnity.** The Guarantor agrees to indemnify each of the Bank, its directors, officers and employees and each legal entity, if any, who controls the Bank (the **"Indemnified Parties"**) and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation or preparation therefore) which any Indemnified Party may incur or which may be asserted against any Indemnified Party as a result of the execution of or performance under this Guaranty; provided, however, that the foregoing indemnity agreement shall not apply to claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Section shall survive the termination of this Guaranty. The Guarantor may participate at its expense in the defense of any such claim.

This Agreement of Guaranty shall be construed in accordance with the laws of the State of Pennsylvania.

REST OF PAGE LEFT INTENTIONALLY BLANK
Signatures on Separate Page

<u>Signature Page of Guaranty</u>

WITNESS:

_____

_____
Linda R. Martorano

**<u>EXHIBIT E</u>**

*An official website of the United States government*

Home (/fdicinformationandsupportcenter/s/?language='en_US')

My Cases (/fdicinformationandsupportcenter/s/mycases?language='en_US')

FDIC Knowledge Center (/fdicinformationandsupportcenter/s/public-information?language='en_US')

Logout (../secur/logout.jsp)

Thank you for contacting the FDIC regarding your business banking concerns on **July 24, 2024**. Your case number is: **01757712.** The FDIC's authority to act on your behalf is limited to the enforcement of federal banking laws and regulations for banks supervised by the FDIC.

Additional correspondence regarding this matter should include your case number and be forwarded to the FDIC at:
Federal Deposit Insurance Corporation
Consumer Response Unit
1100 Walnut Street, Box #11
Kansas City, MO 64106

You may also contact the FDIC at 1-877-ASK-FDIC (1-877-275-3342).
Thank you for bringing this matter to our attention.

Thank you for contacting the FDIC. This automatic response acknowledges receipt of your submission to FDIC on Jul 24, 2024.
The reference number assigned to your case is **01757712**.

## Upload Files

### (HTML attachments are not accepted)

For your protection, PLEASE DO NOT INCLUDE PERSONAL CONFIDENTIAL INFORMATION SUCH AS YOUR SOCIAL SECURITY NUMBER. Please only provide documents supporting the issue you are experiencing with your bank.

 Upload Files

For questions regarding this form, email publicinfo@fdic.gov (mailto:publicinfo@fdic.gov)
Page Updated 09/04/2018